UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INTERFOCUS INC., <br><br> Plaintiff, <br><br> v. <br><br> THE DEFENDANTS IDENTIFIED IN SCHEDULE A <br><br> Defendant. | Case No.: 1:22-cv-2259 |

**DECLARATION OF MARK LEE IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER, INCLUDING A TEMPORARY INJUNCTION, A TEMPORARY ASSET RESTRAINT, AND EXPEDITED DISCOVERY**

## **DECLARATION OF MARK LEE**

I, Mark Lee declare as follows:

1.      I am an attorney at law, duly admitted to practice before the Courts of the State of California and a number of federal courts. I am one of the attorneys for Plaintiff INTERFOCUS INC. ("Plaintiff"). Except as otherwise expressly stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows:

2.      According to U.S. Customs and Border Protection (CBP), most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. See *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared for The Buy Safe America Coalition by John Dunham & Associates. A true and correct copy of this report is attached hereto as **Exhibit 1**. The bulk of counterfeit products sent to the United States "come from China and its dependent territories," accounting for over 90.6% of all cargo with intellectual property rights (IPR) violations. *Id*. Of the $1.23 billion in total IPR violations intercepted, $1.12 billion was from China. *Id*.

3.      According to a report released by the U.S. Chamber of Commerce Global Intellectual Property Center (GIPC) titled "Measuring the Magnitude of Global Counterfeiting," at least 86 percent of all global counterfeit products originate in Chinese and Hong Kong markets. A true and correct copy of an article released by GIPC summarizing the report is attached hereto as **Exhibit 2**.

4.      A February 2017 report commissioned by Business Action to Stop Counterfeiting and Piracy (BASCAP) and the International Trademark Association (INTA) entitled "The

Economic Impacts of Counterfeiting and Piracy" included findings that counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue. A true and correct copy of this report is attached hereto as **Exhibit 3**.

5. In my experience in combating counterfeiting and online piracy over more than twenty-five years, I have observed counterfeiters using a variety of tactics to evade enforcement efforts, including the use of false names, incomplete and misleading physical addresses, using only electronic method to communicate with their third party service providers and customers, locating in countries that have lax intellectual property enforcement mechanism, and upon discovery, quickly shutting down sites through which counterfeit merchandise is sold, to open up new sites through which such sales can continue.

6. In my experience, e-commerce operators' e-mail addresses on their website are reliable means of communication because it relies on such email addresses to at least communicate with its customers. In addition, it relies on the same or other electronic means to communicate with its third party payment platforms or other service providers to operate its business. Physical addresses, especially in foreign countries, are not often used or verified by customers or third party service providers.

7. In my experience, once notice of a lawsuit is received, counterfeiters such as Defendants move any funds from their financial accounts in the U.S. to offshore bank accounts outside the jurisdiction of this Court. Financial account transaction logs indicate that counterfeiters transfer and/or attempt to transfer funds to offshore bank accounts outside the jurisdiction of this Court once they have received notice of a lawsuit. I am informed and believe that the Court has experienced such efforts.

8. For example, in *Volkswagen AG, et al. v. hkseller\*2011, et al.*, No. 18-cv-07621 (N.D. Ill. May 6, 2019), the Court found that defendants took deliberate action to avoid the asset restraint. At Plaintiffs' motion for an asset restraint hearing, defendants' counsel represented that at least $26,000 would remain in the PayPal account at issue until the next hearing a week later. However, I am informed and believe that between December 6, 2018 and December 12, 2018, defendants' PayPal accounts balance was reduced from $61,200 to approximately $26,500. The asset restraint was reinstated at the December 12, 2018 hearing. However, I am informed and believe that shortly after the December 12, 2018 hearing and before plaintiffs could effectuate the reinstated asset restraint, defendants withdrew $20,000 from the PayPal account. I understand that Defendants' counsel later withdrew from representation, and defendants did not file a response to plaintiffs' motion for summary judgment. Judgment in the amount of $200,000 was entered. Defendants have not satisfied the judgment beyond the restrained funds.

9. In *PopSockets LLC v. Xuebo50, et al.*, No. 17-cv-06101 (N.D. Ill. Oct. 12, 2017), a defendant's PayPal account was restrained with an initial balance of $1,611,921. The PayPal account was released with the expectation that defendant would not be able to withdraw several hundred thousand dollars that were being held for potential consumer chargebacks. However, I understand there was a misunderstanding with PayPal, and defendant reduced the account balance from $1,611,921 to $36,469 after receiving notice of the lawsuit. That defendant did not appear in the case, and default and default judgment were entered against it.

10. In my experience, even when defendants are not able to withdraw funds from the accounts, defendants employ other tactics to evade asset restraints. For example, in the case *Monster Energy Company v. Zuichudesecai, et al.,* No. 19-cv-00551 (N.D. Ill. Aug. 8, 2019), I am informed and believe that defendant's PayPal account was restrained with an initial balance

4

of $72,370. Defendant obtained counsel and filed a motion to dismiss. Defendant's motion to dismiss was denied, and subsequently defendant's counsel withdrew from the case. When defendant failed to obtain new counsel or file an answer as ordered by the Court, default and default judgment were entered against the defendant. However, I am informed and believe that during the lawsuit defendant covertly coordinated with buyers to initiate chargebacks that reduced the account to a negative balance of -$17,657.

11. For these reasons, in the absence of an *ex parte* Order, Defendants could and likely would move any assets from accounts in financial institutions subject to this Court's jurisdiction to off-shore accounts.

12. **Exhibit 4** attached hereto is a true and correct copy of the unpublished decisions cited in Plaintiff's Memorandum in Support of its Motion for a Temporary Restraining Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this the 3rd day of May, 2022 at Los Angeles, California.

                                                    */S/ Mark Lee*
                                                    Mark Lee
                                                    Counsel for Plaintiff, INTERFOCUS INC.